# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| STATE OF WASHINGTON, | No. 46456-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ROBERT EDWARD DOTY, | |
| Appellant. | |

BJORGEN, A.C.J. — Following a bench trial on stipulated facts, the trial court found Robert Edward Doty guilty of unlawful possession of a controlled substance. Doty appeals his conviction, asserting that the trial court erred by failing to suppress evidence obtained following what Doty contends was an unlawful arrest. Doty also appeals his sentence, asserting that the State failed to meet its burden of proving his criminal history. We affirm Doty's conviction, but remand for resentencing.

## FACTS

On September 11, 2012, Washington State Department of Corrections (DOC) Officer Rees Campbell and Vancouver Police Officer Adam Millard saw Doty sitting in a car in a residential driveway located in Clark County. Campbell arrested Doty for violation of his DOC

supervision conditions. Millard searched Doty and found a small bag in Doty's pants pocket that contained a substance the officers suspected to be methamphetamine. After Millard advised Doty of his *Miranda*[1] rights, Doty admitted that the substance belonged to him. The substance was later tested and confirmed to contain methamphetamine. On September 13, the State charged Doty with unlawful possession of a controlled substance.

Before trial, Doty filed a CrR 3.6 motion to suppress evidence obtained from the search incident to his arrest, arguing that the search stemmed from an unlawful arrest. The trial court held a hearing to address Doty's suppression motion. At the suppression hearing, DOC Officer Ron Woolcock testified that he was supervising Doty in the community pursuant to an interstate compact transfer from Oregon. Woolcock stated that Doty reported to his office on September 11, 2012 to provide a urine sample. Although Doty's urine sample tested positive for the presence of methamphetamine, Woolcock decided not to arrest him at that time and, instead, sent the urine sample to a laboratory for further testing.

Woolcock testified that he chose to have the urine sample tested at a lab because Doty was being supervised pursuant to an interstate compact with Oregon, and Oregon "like[s] to have the lab results." Report of Proceedings (RP) at 41. Woolcock stated that a lab test returns a positive result for the presence of narcotics at a higher threshold than the "Instacup" test kit used by community corrections officers. RP at 39, 42. Woolcock also stated that he spoke with Campbell later that day and told Campbell that Doty's urine sample had tested positive for the presence of methamphetamine, but that he had elected not to arrest Doty at that time.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Campbell testified at the CrR 3.6 hearing that he had previously been Doty's direct community custody supervisor and that he had arrested Doty "numerous times for probation violations and new violations of law." RP at 48. Campbell stated that on September 11, 2012, he received a phone call from an individual who told him that Doty and Doty's girlfriend, Shannon Rivens, were using and selling methamphetamine. Campbell further stated that he looked up Doty on his computer system to check his community custody conditions and saw that Doty had tested positive for methamphetamine use. When Campbell spoke with Woolcock about Doty's suspected violations, Campbell told Woolcock that he would arrest Doty if he saw him. Later that evening, Campbell and Millard drove to a residence in Clark County to look for a different offender when Campbell saw Doty sitting in a vehicle in the residence's driveway. Campbell testified that Marie Stewart, a felon who was a known drug user and seller, was standing next to the vehicle and was speaking with Doty. Campbell stated that he arrested Doty based on Doty's suspected association with Rivens, association with Stewart, and failed urinalysis test.

Doty's mother, Linda Wilsdon, testified at the CrR 3.6 hearing about her past interactions with Campbell. She testified that the first time she met Campbell was when she was waiting in the parking lot while Doty was at an appointment with the DOC. She stated that Campbell approached her in the parking lot and told her that Doty was being arrested, so "[y]ou go on home, mom. Shoo, you go on home." RP at 70. Wilsdon said that the second time she met Campbell was when he came to her home and called Doty lazy and told him to get a job. Finally, Wilsdon stated that Campbell told her once over the phone that if it was up to him, "Doty [would] never be allowed to live in the State of Washington again, ever." RP at 72.

Stewart also testified at the CrR 3.6 hearing. Stewart denied that she was standing next to Doty's car when officers arrived, stating that she merely waved to him from her back porch.

The trial court ruled that Campbell had a well-founded suspicion that Doty was in violation of his community custody conditions based on the failed urinalysis test and, thus, the evidence obtained from the search incident to Doty's arrest was admissible at trial. The trial court also concluded that Campbell's other purported bases for arresting Doty were inadequate to provide a well-founded suspicion of a community custody violation. The trial court later entered findings of fact and conclusions of law stating the same. After the ruling that the evidence was admissible, the parties agreed to proceed to a bench trial on stipulated facts. Following the stipulated facts bench trial, the trial court found Doty guilty of unlawful possession of a controlled substance and sentenced him to 14 months of incarceration based on an offender score of 9. Doty appeals his conviction and resulting sentence.

ANALYSIS

I. SUPPRESSION OF EVIDENCE

Doty first contends that the trial court erred by failing to suppress the evidence obtained from his arrest. We disagree.

1. Standard of Review

We review a trial court's denial of a motion to suppress evidence to determine whether substantial evidence supports the court's findings of fact and, if so, whether those findings support its conclusions of law. *State v. Dempsey*, 88 Wn. App. 918, 921, 947 P.2d 265 (1997). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 3113 (1994). Unchallenged findings are verities on appeal. *Id.* We review de

novo a trial court's conclusions of law. *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution protect individuals against unreasonable searches and seizures. *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). A warrantless search and seizure is "per se unreasonable, and the State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule." *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). One recognized exception to the warrant requirement is a search incident to a lawful arrest. *State v. Boursaw*, 94 Wn. App. 629, 631-32, 976 P.2d 130 (1999). For this exception to apply, the arrest must be valid. *State v. O'Neill*, 148 Wn.2d 564, 587, 62 P.3d 489 (2003).

Another exception to the warrant requirement is found in RCW 9.94A.631, which applied to the search and seizure of Doty because he was an offender in the community under DOC supervision. *State v. Jardinez*, 184 Wn. App. 518, 523-24, 338 P.3d 292 (2014). RCW 9.94A.631(1) (emphasis omitted) provides:

> If an offender violates any condition or requirement of a sentence, a community corrections officer may arrest or cause the arrest of the offender without a warrant, pending a determination by the court or by the department. If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, a community corrections officer may require an offender to submit to a search and seizure of the offender's person, residence, automobile, or other personal property.

The "reasonable cause" standard of RCW 9.94A.631(1) requires officers to have a "'well-founded suspicion that a violation has occurred'" before arresting or searching an offender

without a warrant. *Id.* at 524 (quoting *State v. Massey*, 81 Wn. App. 198, 200, 913 P.2d 424 (1996)).[2]

2.      Challenged Findings of Fact

Doty first contends that a number of the trial court's factual findings were not supported by substantial evidence in the record. We disagree.

Following the CrR 3.6 suppression hearing, the trial court entered the following factual findings:

1.  This act occurred in Clark County, Washington.
2.  On September 11, 2012, Department of Corrections [DOC] Officer Rees Campbell was on duty and working in Clark County. Officer Campbell knew the Defendant from past experience and knew the Defendant was currently on DOC supervision. The Defendant was on supervision for a drug conviction from 2010 from Wasco County, Oregon. His probation had been transferred to Washington on January 18, 2012.
3.  DOC Officer Ron Woolcock was the supervising officer for the Defendant on September 11, 2012. On that date, the Defendant reported to Officer Woolcock's office and provided a urine sample for drug testing (UA). Officer Woolcock used the Instacup to conduct the test. The Defendant's urine test was positive for use of controlled substances. Officer Woolcock decided not to take the Defendant into custody at that time, and sent the sample to a laboratory for additional testing.
4.  Officer Campbell learned from a computer entry and also directly from Officer Woolcock that the Defendant had provided the September 11, 2012 Instacup positive UA.
5.  Later in the day, Officer Campbell and Vancouver Police Officer Adam Millard went to a residence in Vancouver to search for an unrelated subject. When they arrived, Officer Campbell saw the Defendant sitting in a car in the driveway. The Defendant was in the driver's seat and [was] the only occupant of the car.
6.  Officer Campbell recognized a woman named Angela Stewart standing near the car. It appeared to Officer Campbell that the Defendant and Angela Stewart were engaged in conversation. Officer Campbell knew that Angela Stewart was a convicted felon.
7.  Officer Campbell, at some point prior to this contact with the Defendant, had received information from an anonymous source that the Defendant was engaged in drug activity.

---

[2] The 2012 amendments to RCW 9.94A.631 did not affect the "reasonable cause" requirement of subsection (1).

8.      Officer Campbell arrested the Defendant for violating conditions of probation.

9.      Officer Millard searched the Defendant's person at the request of Officer Campbell. Officer Millard found a small package of methamphetamine in the Defendant's pocket.

Clerk's Papers (CP) at 56-58. Doty assigns error to findings 3, 4, and 7.

As an initial matter, we need not review the evidence in support of finding 7 because the trial court concluded that the "[i]nformation provided to Officer Campbell from an anonymous informant provided no basis to stop, detain, or contact the Defendant." RP at 58. Accordingly, this challenged factual finding was not pertinent to the trial court's conclusions that the evidence seized from Doty was obtained "as part of a valid search incident to arrest" and was admissible at trial. RP at 58.

Regarding finding 3, Woolcock testified at the CrR 3.6 suppression hearing that he had administered an Instacup urine test on Doty on September 11, 2012, and that the test returned a positive result for the presence of methamphetamine. Woolcock further testified that he chose not to arrest Doty at the time and instead decided to send the urine sample to a laboratory for further testing. Woolcock's testimony constituted substantial evidence in support of finding 3.

Turning to finding 4, Campbell testified at the CrR 3.6 suppression hearing that he "saw on our computer system where Mr. Doty had given a positive test for methamphetamine through urinalysis," and that he called Woolcock to confirm that Doty had tested positive for the presence of methamphetamine. RP at 50. Woolcock similarly testified that he spoke with Campbell about Doty's positive urinalysis test. This was substantial evidence in support of finding 4. Because substantial evidence supports the challenged findings, and because Doty does not assign error to the remaining findings, we accept the truth of all of the trial court's factual findings. *Hill*, 123 Wn.2d at 644.

7

3.    Well-Founded Suspicion of a Community Custody Violation

Next, Doty argues that the trial court erred by concluding that Campbell's knowledge of Doty's failed Instacup urinalysis test provided Campbell with a well-founded suspicion that Doty was in violation of his supervision conditions, asserting that the Instacup test was unreliable. We disagree.

Evidence at the CrR 3.6 hearing showed that the Instacup test procedure utilized here returned a positive result for the presence of methamphetamine at a lower threshold than a laboratory test. The positive result at a lower threshold nonetheless supplied Campbell with a well-founded suspicion that Doty had violated his supervision conditions by ingesting methamphetamine. The "reasonable cause" standard of RCW 9.94A.631(1) requires only a well-founded suspicion of a supervision violation to validly arrest an offender without a warrant; it does not require proof beyond a reasonable doubt that the offender in fact violated a condition of his or her supervision in the community.

Doty challenges the reliability of the Instacup test by arguing that his prior Instacup testing had generated two false positives before this event. However, the document, which is part of a DOC report of alleged violations, says nothing about false positives. CP at 36. To the contrary, it states that Doty has provided "3 questionable UA's" in the context of discussing his violation of conditions of supervision. This context makes clear that the report uses "questionable" as a synonym for suspicious, not as a signal of scepticism of its own testing practices. Further, the report merely questioned the UA results; it did not state the results were "false positives."

Doty also appears to rely on Woolcock's decision not to arrest him for the positive result on the Instacup test to argue that his subsequent arrest by Campbell was unlawful. However,

Woolcock's exercise of discretion to not arrest Doty based on the positive Instacup test result has no bearing on whether that test result supplied the officers with a well-founded suspicion that Doty had violated his supervision conditions. Accordingly, the trial court did not err by concluding that Campbell had reasonable cause to arrest Doty.

4.     Pretext

Next, Doty asserts that the trial court erred by failing to conclude that Campbell's arrest was pretextual. We also disagree with this contention.

Doty cites to *State v. Ladson*, 138 Wn.2d 343, 353, 979 P.2d 833 (1999), for the proposition that article I, section 7 of the Washington State Constitution forbids use of pretext as a justification for his arrest and subsequent search. However, *Ladson* addressed pretextual traffic stops, holding that a stop for a traffic offense may not be used as a pretext to investigate another crime. *Id.* at 352-53. The extensive discussion of the rationale underlying the pretext doctrine in *State v. Arreola*, 176 Wn.2d 284, 294-97, 290 P.3d 983 (2012), suggests that the doctrine may not apply to Doty's circumstances. In that discussion, our Supreme Court noted the wide discretion exercised by officers in deciding whether to enforce traffic rules, the complexity and extent of the traffic code, the impossibility of fully enforcing traffic rules, and the enormous threat to privacy posed by the misuse of traffic stops, none of which are operative here. *Id.* at 294-95.

Assuming that the pretext doctrine could apply to Doty's arrest, our Supreme Court has held that a

> mixed-motive traffic stop is not pretextual so long as the desire to address a suspected traffic infraction (or criminal activity) for which the officer has a reasonable articulable suspicion is an actual, conscious, and independent cause of the traffic stop.

9

*Arreola*, 176 Wn.2d at 288. Similarly, a mixed-motive arrest of an offender on community custody under RCW 9.94A.631(1) is not pretextual if an officer's desire to arrest the offender is independently motivated. Here, even assuming that Campbell was partially motivated by bias or dislike to arrest Doty, Campbell was also independently motivated to arrest him based upon a well-founded suspicion that Doty had violated a supervision condition. Accordingly, the trial court did not err by failing to conclude that the arrest was pretextual. Because Doty fails to demonstrate that the trial court erred by admitting evidence seized pursuant to his lawful arrest, we affirm Doty's conviction.

## II. SENTENCING

Next, Doty asserts that he is entitled to a new sentencing hearing because the State failed to prove his criminal history by a preponderance of the evidence. We agree and remand for resentencing.

Due process imposes a burden on the State to prove a defendant's criminal history at sentencing by a preponderance of the evidence. *State v. Hunley*, 175 Wn.2d 901, 909-10, 915, 287 P.3d 584 (2012). The best evidence establishing a defendant's criminal history consists of certified copies of the defendant's prior judgments and sentences. *State v. Allen*, 150 Wn. App. 300, 315, 207 P.3d 483 (2009). A prosecutor's statement of the defendant's criminal history is not sufficient to meet the State's burden. *State v. Mendoza*, 165 Wn.2d 913, 920, 205 P.3d 113 (2009). However, if a defendant affirmatively acknowledges his or her criminal history, he or she "thereby obviate[s] the need for the State to produce evidence." *Id.* at 920. A defendant does not affirmatively acknowledge his or her criminal history by failing to object to the prosecutor's assertion or by agreeing with the prosecutor's ultimate sentencing recommendation. *Id.* at 928.

Under the Sentencing Reform Act of 1981, chapter 9.94A RCW, an out-of-state conviction is included in a defendant's offender score if the prior offense is comparable to a Washington offense. RCW 9.94A.525(3). The classification of out-of-state convictions is a mandatory step in the sentencing process. *See* RCW 9.94A.525(3) (emphasis added) ("Out-of-state convictions for offenses *shall* be classified according to the comparable definitions and sentences provided by Washington law."). The State bears the burden of proving the existence and comparability of a defendant's out-of-state convictions. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187, *cert. denied*, 135 S. Ct. 287 (2014). A defendant's affirmative acknowledgment of his offender score does not relieve the State of its burden of proving the comparability of out-of-state offenses. *State v. Lucero*, 168 Wn.2d 785, 789, 230 P.3d 165 (2010).

Here, the only evidence the State produced at sentencing to prove Doty's criminal history was its own declaration of Doty's criminal history, which declaration included several purported out-of-state convictions that were used to calculate Doty's offender score. Doty and Doty's defense counsel declined to sign the State's declaration of Doty's criminal history. The record does not show that the sentencing court performed a comparability analysis of Doty's out-of-state convictions.

The State does not contend that its criminal history declaration was sufficient to prove Doty's criminal history or the comparability of his out-of-state convictions, but it argues that Doty relieved the State of its burden at sentencing by his defense counsel's affirmative acknowledgment that Doty's offender score was correctly calculated. Our Supreme Court rejected a nearly identical argument in *Lucero*, holding that a defendant's concession to an offender score that would necessarily include an out-of-state conviction did not constitute an affirmative acknowledgment that the out-of-state conviction was comparable to a Washington

11

offense. 168 Wn.2d at 788-89. Pursuant to *Lucero*, we remand to the trial court for resentencing at which both "parties shall have the opportunity to present and the court to consider all relevant evidence regarding criminal history, including criminal history not previously presented." RCW 9.94A.530(3); *see State v. Jones*, 182 Wn.2d 1, 11, 338 P.3d 278 (2014).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

We concur:

LEE, J.

MELNICK, J.